IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

MORSE ELECTRIC, INC.,

        Plaintiff,

v.                                          Case No.  22-CV-91-JWB-GLJ

STEARNS, CONRAD AND SCHMIDT, CONSULTING ENGINEERS, INC.,

        Defendant.

## MEMORANDUM DECISION

Morse Electric, Inc. ("MEI" or "Plaintiff") filed a complaint against Stearns, Conrad and Schmidt, Consulting Engineers, Inc. ("SCS" or "Defendant") asserting claims of breach of contract, tortious interference with prospective economic gain, and violations of the Minnesota Prompt Payment Act.  (Doc. 2.)  Defendant counterclaimed for breach of contract.  These claims all arose from the course of performance of a contract between the parties which required Plaintiff to perform electrical construction services for the Pine Bend Renewable Natural Gas Production Facility (the "Project") in Inver Grove Heights, Minnesota.  This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).  The court presided over a bench trial April 22–25, 2025, and took the matter under advisement.  The court has thoroughly considered the evidence and arguments presented at trial, the parties' post-trial submissions, and the relevant law, and makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

For the reasons discussed herein, the court enters judgment for Defendant and against Plaintiff on all of Plaintiff's claims.  The court also enters judgment for Defendant and against Plaintiff on Defendant's counterclaim of breach of contract.

1

I.    **Findings of Fact**

The following sets forth the facts material to the issues determined by the court. Where appropriate, additional facts found by the court will be discussed throughout the following section on the conclusions of law.

Plaintiff is an Oklahoma corporation that specializes in providing electrical services in the oil and natural gas industry. Defendant is an engineering firm specializing in environmental consulting and contracting. Defendant hired PDDM Solutions, LLC ("PDDM") to provide construction management services after it entered into the prime contract with Pine Bend (the "Owner") for the Project. The prime contract was executed on September 9, 2020, and it set March 1, 2022, as the substantial completion date for the Project.

On June 9, 2021, the parties executed a service purchase order (the "subcontract"). (Ex. 801 at 3.) The subcontract was executed by Brian Morse, co-owner of MEI, and Darren Nightingale, SCS's project manager. The subcontract was for a fixed price lump sum amount of $1,771,100. The subcontract included as attachments the prime contract, the drawings and specifications for the electrical work, and MEI's proposal.[1] The subcontract, however, stated that MEI's bid proposal was for informational purposes only. (*Id.* at 6.) Under the subcontract, MEI agreed to perform the electrical contractor work under the prime contract as demonstrated in the drawings and specifications attached to the subcontract. The drawing and specifications were included in Attachment D as the Issued for Construction ("IFC") electrical construction drawings and specifications. (*Id.* at 1, 64–121.) The IFC drawings were dated April 12, 2021, and the baseline drawings were referred to as "Rev 0."

---

[1] The court's conclusions of law as to the terms of the subcontract are discussed *infra*.

The subcontract contains a provision that SCS may unilaterally order changes in the work. (*Id.* at 4.) Throughout the performance of the subcontract, there were revisions to the IFC drawings. Under the terms of the subcontract, however, a written change order by SCS was required in order for an adjustment to the contract price.

MEI was to submit invoices for work performed to SCS for its review and approval. SCS was to pay MEI 45 days after the receipt of the approved invoice; however, SCS was not obligated to make payment until 15 days after SCS received payment from the Owner. (*Id.*) SCS also withheld retainage of 5% from the payments made to MEI. Under Article 6 of the subcontract, retainage could be withheld and was due to MEI after total completion of the work by MEI and final inspection and acceptance by SCS and the Owner. (*Id.*) The subcontract also allowed SCS to withhold payment for various reasons, including reasonable evidence that the work could not be completed for the unpaid balance of the contract price or that the work cannot be completed within the work schedule. (*Id.* at 5.) Attachment A included additional terms for the subcontract, including a provision which stated that SCS could have a third party complete the work under the agreement should MEI fail to comply with the subcontract. (*Id.* at 20.)

The subcontract also provided that the project was "sales tax exempt" and that MEI was liable for all taxes incurred in performing the work. (Ex. 801 at 4, 12.) SCS provided MEI with a sales tax exemption form on June 11, 2021, along with instructions on the form. (Ex. 1039.) The sales tax exemption forms were provided to all the subcontractors on the project. Ultimately, MEI paid sales taxes on the materials purchased for the project even though it was issued the exemption; none of the other subcontractors made claims to SCS for reimbursement of sales tax. (Doc. 199, Tr. 24:4–15.)

Turning to the performance, MEI mobilized to the Project shortly after the execution of the subcontract. Jon French was Plaintiff's project manager but was not at the job site daily. As the project manager, French's job duties involved developing the schedules sent to SCS, tracking MEI's work performed, developing the scope of work and pricing for any change orders, and timely submitting change orders. (Doc. 200, Tr. at 256–57.) Nightingale was SCS's project manager for the Project. Nightingale was also not on site every day and only visited the site a handful of times during the Project.

By June 15, 2021, electrical materials were arriving at the site. By June 17, MEI started laying out duct banks and prefabricating conduits. MEI employees Christy Dunstan and Brian Wilson directed and oversaw MEI's work at the Project. The work was tracked using MEI's daily progress reports ("DPR") which were created in Excel. (Doc. 200, Tr. 94:24–96:11.) The DPRs included a daily description of work performed, any job site delays, and sections for daily progress on the work. (*See, e.g.* Ex. 1215-c.) Morse testified that there should be a DPR for every day that MEI was working on the project. The DPRs indicated the personnel on site working on the project. (Doc. 201, Tr. 9:22–23.)

When invoices were submitted to SCS for payment, MEI included a project tracking worksheet. This worksheet identified the number of labor hours performed for various tasks under the subcontract. (*See, e.g.*, Ex. 1216-a at 3.) The worksheet had line items for labor hours planned, actual labor hours, and the percentage complete for each task. It also identified the percentage of total job completion. For example, the invoice dated July 2, 2021, states that the field install was 6% complete. (*Id.*) As evidenced at trial, those percentages grew with each invoice submitted. Based on the project tracking worksheet, the amounts billed reflected the amount of time spent working towards the tasks that were being completed. Nightingale testified that he understood

that MEI invoiced based on the percentage of work completed.  (Doc. 199, Tr. at 35–36.)  Morse also testified that the progress payments are based on the progression of the labor and materials being installed.  (Doc. 200, Tr. at 255:22–256:2.)

MEI was also required to submit its schedule in Microsoft Project format to PDDM.  (Doc. 199, Tr. 105:13–106:11.)  During the project, MEI through French submitted schedules to PDDM and those schedules made representations regarding the percentage of MEI's work that was complete.  MEI's schedule was then incorporated into a master schedule by PDDM along with other subcontractor's submitted schedules.  For example, on August 31, 2021, French sent MEI's schedule to PDDM and it indicated that MEI was 21% complete with its work on the project.  (Ex. 1217-ab.)

During the project, there were five bulletins issued for changes to the IFC drawings. Changes to the drawings were identified on each revised drawing sheet by a notation of revision in the revision block.  The block would indicate the number for the revision and the date of the revision.  (Ex. 801 at 64.)  Changes on the drawings were also noted by clouding around the change on the drawing sheet and a small triangle with a revision number next to that change.  (Doc. 199, Tr. 170:18–171:15.)  While the triangle with the revision number would remain on subsequent bulletins, the clouding around the change would only appear on the bulletin when the change first appeared.  (*Id.*)

SCS submitted the updated drawings to MEI through software called Newforma.  MEI received the bulletin updates submitted by SCS.  (Doc. 200, Tr. 87:16–18.)  Bulletins 1 and 2 were updates to the cable and conduit schedule, Bulletin 3 was a change request from MEI, and Bulletins 4 and 5 related to the fire pump house.  (Doc. 199, Tr. 164:6–12).  SCS expected the contractors

5

to review the changes in the bulletins within a few days of receipt and, if necessary, request a change order from SCS for the cost and schedule impact. (*Id.* at 171:16–25.)

There were several change orders issued during the work on the project. There were change orders between Pine Bend and SCS ("Pine Bend Change Order") on the prime contract and change orders between SCS and MEI ("SCS Change Order") on the subcontract. There were also proposed change orders submitted by MEI ("MEI Proposed Change Order"). If the MEI Proposed Change Order was accepted, a SCS Change Order would issue. The parties executed five SCS Change Orders during the project that increased the amount of the contract to $1,804,568.04. On November 19, 2021, SCS emailed French unexecuted SCS Change Order 6 which was a service purchase order for $86,461.36 to perform the underground work related to the fire pump house. (Ex. 992; Doc. 199, Tr. 5:12–19.) The parties did not execute SCS Change Order 6.

On November 24, MEI's project tracking worksheet submitted with Invoice 1298 represented that it had installed 52% of the work under the subcontract. (Ex. 1216-a at 57; Doc. 200, Tr. 265:1–4.) On December 22, MEI submitted Invoice 1307 and indicated that it was 71% complete with the install work under the subcontract.

On January 11, 2022, French submitted the MEI schedule to PDDM that represented that MEI was 81% complete with its work on the project and the estimated completion date was February 5. (Ex. 1217-aq.) On that same date, Christopher Kujawa with PDDM emailed French regarding a conversation between him, French, and Dunstan. Kujawa asked French to explain "how MEI field reports didn't match what was really completed, reported and to some extent as [Dunstan] wasn't able to verify some things I'd appreciate it." (Ex. 1022.) French testified that at that point in time he realized that the DPRs were incorrect and there was additional work that he

had not accounted for.  (Doc. 200, Tr. 106:21–107:12.)  On January 19, French emailed Nightingale to set up a meeting regarding "contract end date and change orders."  (Ex. 977.)

On January 24, MEI sent Proposed Change Order 16 to SCS which requested an additional 10,500 hours to complete the scope of work as set forth in the original drawings.  MEI stated that the scope of work did "not include any changes associated with any Bulletin updates."  (Ex. 967 at 6879.)  Proposed Change Order 16 requested $498,832.  Proposed Change Order 16 was not approved by SCS.  On January 28, Nightingale told Morse that SCS had reviewed MEI's proposed change order and initially determined that it did not have merit.  (Ex. 980 at 46526–27.) Nightingale stated that SCS would continue to review and engage in discussions with MEI.

On February 1, MEI's employees on site reported to Tim McCune with PDDM that they were going to be leaving the site on February 4 (Friday) at noon.  (Ex. 959.)  On February 2, MEI's submitted schedule indicated that it was only 67% complete with its scope of work under the subcontract. (Ex. 1217-au.)  This percentage complete was approximately 14% less than what was reported on January 11 to PDDM.  (Ex. 1217-aq.)  MEI also indicated in the February 2 schedule that its estimated completion date was March 28, 2022.  On that same date, Morse responded by email to Nightingale's January 28 email regarding Proposed Change Order 16.  (Ex. 1216-r.) Morse stated that MEI was "organizing materials and getting any unused equipment out of the building where we may move forward in the future should SCS validate change order."  (*Id.*)

From February 1 to 4, MEI employees packed up several items on the worksite and ultimately removed those items.  The DPRs for February 3 and 4, 2022, stated that MEI was "Demobilizing."  (Ex. 1215-a, 1215-c.)  There were no further DPRs for MEI after February 4. On February 4, MEI's employees left the site by 1:00 p.m.  At approximately 6 p.m., Nightingale emailed MEI to raise several issues including: concern that MEI was abandoning the project;

notice of MEI's default under the subcontract; notice that SCS believed that MEI had overbilled on the project given the significant change in the representations regarding the work completed; potential overbilling in Invoice 1307; SCS was considering hiring a third party to complete the work if MEI did not return to the project; and that SCS was considering withholding payment under the subcontract. (Ex. 970.) On Monday February 7, MEI was not at the project site. MEI also did not attend the weekly call with PDDM scheduled for February 7. Although French typically participated in these calls, Morse told French not to participate on February 7. (Doc. 200, Tr. 276:12–23.) On the evening of February 7, Nightingale sent MEI another email in which he recognized that MEI had disputes with SCS and that MEI sought the approval of the proposed change order but that MEI must report to the site and continue to work on the project while preserving its rights under the subcontract. (Ex. 972.) MEI did not report to the site on February 8.

On February 8, MEI submitted Proposed Change Order 19 to SCS. (Ex. 973 at 7422.) MEI requested an additional $1,299,000 to complete the work on the project. This proposed change order was not approved by SCS. SCS again instructed MEI to return to the job site. (Ex. 957.)

On February 16, MEI submitted Invoice 1318 for $362,852.50. (Tr. 906.) This invoice was accompanied with Proposed Change Order 20. According to MEI, the invoice and change order were due to the cable and conduit changes in the Bulletins which "were not captured in [an] official change order until now due to non-standard engineering practice of clouding or noting changes or additions." (*Id.* at 7593) At trial, French testified that Proposed Change Order 16 "morphed" into Proposed Change Order 20. (Doc. 200, Tr. 85:18–20.)

On February 16, SCS notified MEI that it was in default under the subcontract and that it was exercising its rights under Section 13 to have the work completed by a third party. (Ex. 955.) SCS also informed MEI that it was exercising its right to withhold payment due to the default. SCS hired PCL Industrial Services Inc. ("PCL") to complete MEI's remaining scope of work under the subcontract. The purchase order for services was executed on February 16. (Ex. 1101.)

Pine Bend submitted payment to SCS for Invoice 1307 on February 18, 2022. (Ex. 808.) On February 21, SCS again notified MEI that it disputed Invoice 1307, that payment for that invoice was not untimely because it had not been paid for that invoice until February 18, and that it was exercising its right to withhold payment. (Exh. 976.)

On March 16, Nightingale, French, and PDDM personnel performed a project walkdown to determine the scope of MEI's work. The parties used MEI's February 2 schedule to determine the completion status. Based on that walkdown, it was determined that MEI completed less than 67% of the work under the subcontract. MEI actually completed approximately 62% of the work under the subcontract. (Doc. 199, Tr. 151:7–154:2; Ex. 1327.)

As of February 4, 2022, SCS had paid MEI $1,498,459.61 under the subcontract. (Doc. 126 at 2.) With each invoice, MEI submitted a general release and waiver for claims relating to labor and materials provided through the date of the invoice. (*See* Ex. 1216-a.) The waivers were effective upon payment and signed by Brian Morse. (*Id.*) Invoice 1298 was submitted on November 24, 2021, and was paid by SCS. (*Id.* at 58–59; Ex. 920.) With the exception of the first invoice, SCS withheld retainage from the payments to MEI. (Ex. 1216-a.) The total amount of retainage withheld was $68,330.63.

The PCL-SCS purchase order was for the completion of MEI's electrical work scope on the project. (Ex. 1101; Doc. 201, Tr. 85:20–23.) PCL initially mobilized to the site around

February 22 in order to review MEI's work and test cables.  PCL began working on the project after receiving its license and electrical permit sometime in the middle of March.  (Doc. 201, Tr. 97:5–10; Ex. 811 at 2101.)  PCL invoiced SCS for its work on the project.  PCL submitted 22 invoices to SCS.  (Ex. 811-32.)  PCL completed MEI's scope of work on July 21, 2022.  The findings of fact regarding PCL's work completed will be addressed in the conclusions of law regarding damages.

## II.     Conclusions of Law

The laws of the state of Minnesota apply to this matter pursuant to the terms of the subcontract.  (Ex. 801 at 6; Doc. 126 at 2.)

### A.  Breach of Contract

Both parties have asserted claims of breach of contract.  Under Minnesota law, to establish a claim of breach of contract, a party must prove the following by a preponderance of the evidence: (1) formation of a contract; (2) performance by Plaintiff; (3) a material breach of the contract by Defendant; and (4) damages.  *Nelson v. Am. Fam. Mut. Ins. Co*., 899 F.3d 475, 480 (8th Cir. 2018). The subcontract is a valid contract between SCS and MEI.  MEI was to perform under the subcontract by completing the electrical work on the project and SCS was to perform by paying the invoices once they received payment for the same from the Owner.

Because MEI has raised an issue as to whether certain terms are part of the subcontract, the court will first consider what documents comprise the agreement between the parties.  Both parties included the subcontract as an exhibit at trial.  (Ex. 41, 801.)  Both exhibits are comprised of the same 306 pages.  The document is titled "CONSTRUCTION SERVICE ORDER" and includes a cover sheet stating that "this service order consists of the following documents."  (Ex. 801 at 1.)  It goes on to identify the cover sheet, service order, SCS Request for Proposal, and other

attachments including the prime contract for the project. MEI argues in its post-trial briefing that Section 13 of SCS's terms and conditions is not included in the parties' agreement because it wasn't part of the executed service order which is the very first document listed on the cover page. (Doc. 211 at 19.) MEI is correct that Section 13 of SCS's standard terms was not included in that document. (Ex. 801 at 3–7.) For some reason, SCS's standard terms and conditions skip from 10 to 16 in that document. SCS's standard terms and conditions, however, are set forth in the RFP which is attached at Attachment A to the construction service order and referenced on the cover sheet. MEI's post-trial argument that these terms are not a part of the agreement because they are contained in an attachment is contrary to the parties' position throughout trial and during the course of their relationship. At no point has MEI asserted that Section 13 is not part of the parties' subcontract. Rather, MEI's own exhibit for the parties' contract includes the same documents that are in Exhibit 801. (Ex. 41 titled "SCS-MEI Contract.") Further, MEI's stated position is that its own proposal (Attachment J to the construction service order) is part of the parties' agreement because it was attached to the service order. (Doc. 209 at 116.) Morse also testified that he believed the attachments to the construction service order, including MEI's proposal, were all part of the contract between the parties. (Doc. 200, Tr. 163:20–165:6.)

Based on the evidence at trial and the exhibits, the court finds that the documents contained in Exhibit 801 constituted the parties' entire agreement and the agreement was a valid contract. Under the terms of that agreement, however, MEI's bid proposal was included for informational purposes only and the parties were not bound by the proposed terms in that attachment. (Ex. 801 at 6.)

<u>MEI materially breached the subcontract</u>. The court finds that SCS performed under the subcontract and that MEI breached the subcontract by leaving the site on February 4. Under the

subcontract, time was of the essence and MEI was to "proceed with the work in a prompt and diligent manner." (Ex. 801 at 4.) Further, the agreement provided that MEI was to continue its work under the subcontract without disruption or delay when there was a dispute between the parties. (*Id.* at 21.) When a contract contemplates that time is of the essence, a failure to perform within the given schedule is ordinarily a material breach. *See Aadland v. Ranweiler*, No. A-17-1234, 2018 WL 1902457, at *5 (Minn. Ct. App. Apr. 23, 2018) (citing *Grant v. Munch*, 54 Minn. 111, 114, 55 N.W. 902, 903 (1893) ("It is now thoroughly established ... that the intention of the parties must govern, and if the intention clearly and unequivocally appears from the contract, by means of some express stipulation, that time shall be essential, then the time of completion, or of performance, or of complying with the terms, will be regarded as essential in equity, as much as in law."). Here, although there was not an indication on the face of the service order as to the start and end dates, the prime contract set forth the substantial completion date as March 1, 2022. (Ex. 801 at 39.) The prime contract was incorporated into the parties' agreement as determined herein. Further, the evidence at trial clearly showed that MEI had knowledge of the expected end date of the project in March 2022 and that all of the weekly scheduling meetings were focused on a timely completion of the project. The subcontract is also clear that time was of the essence. Therefore, MEI's actions in leaving the jobsite and refusing to return after repeated requests to do so constitutes a material breach.

At trial, both French and Morse testified that MEI did not intend to stop working on the project on February 4. The court does not find their testimony to be credible. French testified that MEI was merely mobilizing materials outside so that they could begin work on the outside portion of the project. That testimony, however, is not credible given that MEI's own employees reported that MEI was going to leave the project and MEI's DPRs indicated that they were "demobilizing."

12

On February 4, MEI employees reported to PDDM personnel that MEI was "done with the project." (Ex. 994-hd.) Further, all communication from MEI indicated that MEI would not return to the job site unless SCS agreed to the proposed work orders and MEI made no attempt to return to the jobsite after February 4.

Next, Morse testified that he required MEI to leave the jobsite due to potential safety concerns and that MEI was performing a safety standdown when it left the jobsite on February 4. French also asserted that their safety was a reason that they left the jobsite. The court does not find Morse and French's testimony credible. As shown at trial, there were weekly meetings to address all issues on the project. There was no evidence that MEI had any concerns regarding unsafe conditions on the site that were raised during the weekly meetings. On January 14, 2022, there was an incident with an MEI employee who was sick. The report indicates that they were not sure if he had contracted COVID-19 while on the job site. (Ex. 966 at 6833.) MEI did not report this to SCS at the time it occurred. On January 17, MEI's safety inspector performed an inspection and recommended getting CO2 detectors for the site and that the site be cleaned up due to congestion with materials. (*Id.* at 6828.) MEI, however, did not communicate any of these concerns to SCS and delayed transmitting the safety report until January 24, 2022. Had MEI been genuinely concerned about the safety of its employees and the congestion of the job site, MEI would have immediately conveyed the concerns to SCS on the day of the incident. Notably, MEI's safety inspector told MEI to immediately take action on January 14 by removing personnel and obtaining the CO2 detectors. (*Id.* at 6834.) MEI, however, failed to take any action on January 14 or even notify SCS that there were serious safety concerns. Rather, MEI continued to allow its employees to work at the site. Also, upon receiving the report on January 24, Nightingale notified the SCS safety contact who then performed a site inspection and directly addressed all concerns

13

with the contractors.  (Ex. 957 at 1140–41; Doc. 199, Tr. 86:1–10.)  There were no further safety incidents and no evidence that MEI made any further complaints about safety to SCS or PDDM.

Morse also testified that MEI intended to return to the jobsite the next week and that he advised Tim McCune on February 3 that they were cleaning up the job site due to safety issues. (Doc. 200, Tr. at 200:1–23.)  The exhibits admitted at trial, however, do not support this testimony. Rather, Morse told PDDM that MEI was removing "duplicate material that somehow got ordered twice."  (Ex. 959.)  McCune from PDDM was understandably concerned about the removal of SCS material from the jobsite and emailed MEI.  In response, Christy Dunstan told McCune that the material being removed was extra material that was brought in from other jobs and not being used.  (Ex. 961.)  Had the true reason for the removal of material been due to safety concerns that were so significant MEI needed to abandon the jobsite, why would MEI represent on February 3 that the materials being removed were duplicate or extra materials?  MEI fails to point to any contemporaneous communication from anyone at MEI during the period where MEI was packing up the materials on the jobsite and leaving that would support its current contention regarding its actions.  Rather, the first mention of safety concerns on February 4 occurred in MEI's email of February 7.

Contrary to MEI's assertion that leaving the site on February 4 was a safety standdown, the court finds that they intentionally left the site in order to renegotiate the subcontract and would not return to work unless SCS agreed to their changing demands in the proposed change orders submitted in February 2022.  The safety excuse was a post-hoc fabrication in order to justify MEI's leaving the job site.  The subcontract clearly required MEI to continue to work during any disputes and also explicitly stated that time was of the essence.  The court finds that MEI's actions in leaving the job site on February 4 and refusing to return constituted a material breach of the subcontract.

14

<u>MEI's assertion of material breach by SCS.</u>  MEI contends that its actions are excused because SCS first committed a material breach by failing to pay invoice 1307, changing the scope of work without notice, and causing delays in the project.  Under Minnesota law, a party who first materially breaches a contract is precluded from prevailing on its claim for a subsequent breach under the "prior breach doctrine."  *Carlson Real Est. Co. v. Soltan*, 549 N.W.2d 376, 379 (Minn. Ct. App. 1996) ("Under general contract law, a party who first breaches a contract is usually precluded from successfully claiming against the other party.")  Essentially, "[t]he first breach serves as a defense against the subsequent breach."  *Id.* at 380.  The court will address the arguments in turn.

***Invoice 1307***.  MEI asserts that SCS materially breached the subcontract by failing to pay Invoice 1307 which was approved and accepted by SCS on January 4, 2022.  MEI received payment for that invoice on February 18.[2]  Under the subcontract, SCS was not required to pay until it received payment from the Owner and, after payment from the Owner, was obligated to pay within 15 days.  (Ex. 801 at 4.)  Therefore, as SCS was not in possession of the funds prior to February 4, it cannot have first breached the subcontract by failing to pay the invoice.  SCS also gave notice to MEI prior to February 18 that it was not paying Invoice 1307 and it disputed that invoice based on the determination that MEI's representation of work completed was inaccurate.  Essentially, SCS had valid concerns that MEI did not perform the percentage of work completed as represented in the invoice.

---

[2] MEI also asserts that it had a right under the Minnesota Prompt Pay Act to suspend work for nonpayment.  (Doc. 209 at 70–71.)  This argument fails for two reasons: one, the invoice was disputed as discussed *infra*; two, contrary to MEI's assertion that SCS received payment from the Owner on January 18 for this invoice, the evidence at trial was that SCS did not receive payment from the Owner until February 18.  *See* Minn. Stat. 337.10 subd. 3 ("A building and construction contract shall be deemed to require the prime contractor and all subcontractors to promptly pay any subcontractor or material supplier contract **within ten days of receipt by the party responsible for payment of payment for undisputed services** provided by the party requesting payment...)

The court finds that SCS did not commit a material breach prior to February 4 with respect to Invoice 1307.

***Change Order Number 6***.  MEI contends that SCS breached the subcontract by failing to pay Invoice 1312 which was associated with Change Order 6.  The invoice was submitted on January 18, 2022, which was after PDDM had alerted French to the apparent discrepancy in the percentage of MEI's work completed as reported on MEI's January 11th schedule update.  (Ex. 899, 900.)  That invoice was for underground work for the fire pump house.  SCS argues that the work was not approved under the subcontract and that MEI did not complete the work.  SCS further argues that it properly disputed the invoice and it was not due until after MEI first committed a material breach under the subcontract.

Under the subcontract, a written change order that modifies the contract price must be executed by SCS.  (Ex. 801 at 4.)  Change Order 6 was not signed by SCS.  It was, however, approved by SCS according to Nightingale.  (Doc. 199, Tr. 190:8–18.)  On November 19, 2021, it was also sent to MEI by SCS in an email which stated "please see attached CO 6."  (Ex. 992.)  SCS did not pay Invoice 1312, however, because it believed that MEI had over invoiced for the work performed and MEI had abandoned the job site in February.  (Doc. 199, Tr. 190:19–191:5.)  SCS never approved Invoice 1312 and did not send it to the Owner for payment.  (*Id.* at 203:10–21.)  Under the subcontract, SCS is not required to pay an invoice until after it has been paid by the owner or 60 days have passed.  (Ex 801 at 4.)  Notwithstanding the issues regarding overpayment and whether the work was performed, SCS did not commit a material breach prior to February 4 by not paying Invoice 1312 as it was not due at that point in time because it had not been approved nor had it been paid for by the Owner.  The court does find, however, that SCS

expanded the scope of work under the agreement, accepted Change Order 6 even though it was not executed, and Change Order 6 increased the price under the subcontract.

***Changes to the Work Scope without Notice and Delays.*** MEI contends that SCS committed a material breach by failing to manage the delays in the project, by increasing the scope of work without notice, and failing to approve the proposed change orders.

MEI asserts that SCS had a duty to not delay, hinder, or interfere with MEI's performance under the subcontract, that the delays did hinder MEI's performance, and that SCS breached its duty of good faith and fair dealing by doing so. (Doc. 209 at 102.) Minnesota law provides that "contract performance is excused when it is hindered or rendered impossible by the other party." *Cox v. Mortg. Elec. Registration Sys., Inc*., 685 F.3d 663, 671 (8th Cir. 2012) (quoting *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984). Furthermore, "a breach of contract occurs under those circumstances." *Id.*

MEI cites to delays at the job site during the construction of the facility. Morse sent a recovery plan to SCS on January 24, 2022 that identified several delays caused by different contractors or SCS at the worksite. (Ex. 967.) Those delays identified several areas but all appeared to be resolved on November 12, 2021 by the latest. (*Id*. at 6876–77.) MEI's brief on the issue of delays generally states there were 66 total delays by multiple trades but fails to specifically identify the dates in the record that those delays occurred. (Doc. 209 at 63.) The proposed findings of fact submitted by MEI cite to a delay in obtaining the building permit in March 2021 and a delay in the delivery of the steel for the building. (*Id.* at 2.) Then there were general delays discussed from French's testimony but all of those appear to be related to the ones discussed in the recovery plan.

17

SCS asserts that MEI has waived any claim prior to November 24, 2021 based on the waiver executed with Invoice 1298 that was paid by SCS. (Ex. 1216-a at 58–59; Ex. 920.) The court agrees. The waiver was conditional upon payment and released SCS from any and all claims regarding the project up to that date, including for breach of contract. MEI asserts that the waiver is invalid because such a waiver is void and unenforceable under Minnesota law. (Doc. 209 at 100.) Under Minn. Stat. § 337.10(2), a waiver is void and unenforceable if a subcontractor is required to waive its right to a claim before payment. The waiver at issue did not require MEI to waive its right to claims under the subcontract prior to payment. Rather, the waiver stated that the waiver would be effective upon payment as long as the check was not returned unpaid by the bank. (Ex. 1216-a at 58.) Therefore, the court finds that it is a valid waiver and any delay claim prior to November 24, 2021 has been waived by MEI.

It is MEI's burden to show that SCS breached its duty to act in good faith by hindering its performance. MEI has failed to point to any evidence pertaining to SCS's conduct or any other subcontractor after November 24, 2021, that would support a finding that SCS hindered MEI from performing under the subcontract. Rather, the evidence was that MEI was at the project site and performing under the agreement up until February 4. Therefore, the court finds that SCS did not breach its duty of good faith with respect to any delays in the project.

Nex, MEI asserts that SCS breached its duty of good faith and fair dealing by not clouding changes to electrical plans and not issuing change orders for the additional work. (Doc. 209 at 92.) Under Minnesota law, every contract contains an implied covenant of good faith and fair dealing but this covenant does not "extend to actions beyond the scope of the underlying contract." *Monticello MN MHC, LLC v. Kjellberg's Inc.*, No. 23-1559, 2024 WL 1886125, at *4 (D. Minn. Apr. 30, 2024) (quoting *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502

(Minn. 1995). While a plaintiff need not first establish a breach of contract claim to prove a claim of breach of the implied covenant, the claim must be "based on the underlying agreements." *Cox*, 685 F.3d at 670.

The subcontract provides that SCS may unilaterally make changes to the work, including additions, deletions or other modifications and the contract price and schedule will be adjusted accordingly. (Ex. 801 at 4.) Any change to the price required a change order signed by SCS and the work was to be performed without delay. (*Id.*) SCS expected the subcontractors to review the changes and to timely submit a change order request if the changes would require any cost or schedule impact. (Doc. 199, Tr. 171:16–25.) MEI's assertion throughout its briefing that SCS was to initiate a change order based on the changes in the bulletins is not supported by the subcontract or the evidence. It was clear from the evidence that the practice was, as relevant here, for SCS to issue revised drawings that identified changes in a number of ways, including by marking changes with clouding on the affected drawings. The subcontractors would review those changes and submit proposed change orders showing how the changes would impact the schedule and/or cost. SCS would then issue a change order when the changes to the schedule and/or cost were approved. This was how the parties performed during the subcontract. MEI proposed change orders for changes in the work and then SCS issued change orders for the changes that were approved. MEI's contention now that SCS somehow has to initiate the change order is not supported by the evidence.

The initial IFC drawing package was dated April 12, 2021, and identified as Rev 0. These were the drawings that MEI used to make its lump sum bid to SCS. There were subsequent changes to the drawings that either added or subtracted from the scope of work MEI was to perform under the subcontract. MEI was notified about these changes when they were made though

bulletins and these updated bulletins were sent through Newforma.  Bulletins 1 and 2 were cable and conduit schedule updates, and Bulletin 3 was a change request from MEI.  Bulletins 4 and 5 related to the fire pump house.

Bulletin 1 was submitted to MEI on July 8, 2021.  (Ex. 946.)  It included the cable and conduit schedule and the Revision 1 drawings.  (Ex. 947, 948.)  SCS submitted Bulletin 2 to MEI on August 13, 2021.  (Doc. 949.)  This included the cable and conduit schedule and the drawings.  (Ex. 950, 951.)  Bulletins 4 and 5 were issued in November and involved work for the fire pump house.  MEI submitted Proposed Change Order No. 9 for the underground work on the fire pump house and SCS then issued Change Order No. 6 for this work.  MEI, however, did not submit any proposed change orders for the work in Bulletins 1 and 2.  MEI claimed at trial that SCS failed to disclose the amount of changes to the electrical work in Bulletins 1 and 2 because the changes were not clouded on the drawings.  The court offered French an opportunity to show any change that was not clouded on the drawings.  He did not do so.  Rather, it was clear after painstakingly going through the drawings that all changes to the electrical work that were new in the bulletin at issue were clouded.  The changes were not clouded on subsequent bulletins because they were no longer new changes.  Therefore, if there was a change to the drawing that was new, the change was reflected in the Bulletin.  MEI's assertion that SCS failed to cloud changes to the drawings was not supported by the evidence.  Further, to the extent MEI is suggesting that SCS was required to continue to show clouding on subsequent drawings, that assertion is not supported by any practice of the parties.  Rather, the practice was to cloud the drawing in the bulletin where the change first occurred and then to leave a triangle with the revision number on subsequent bulletins next to the change at issue.

Based on the evidence at trial, it is clear to the court that SCS promptly provided MEI with any changes to the drawings. It was MEI's responsibility to determine whether the changes in the bulletins necessitated a change order and then submit that proposed change order to SCS. MEI, most likely French as it was his responsibility as project manager, failed to adequately review the bulletins, particularly 1 and 2, upon receipt of the same. Then, when French later reviewed Bulletin 5 and observed that the drawings appeared different than the Rev 0 drawings, he was convinced that SCS failed to cloud changes in Bulletin 5.[3] That was not what occurred, however, based on the evidence. MEI's post-trial brief provides some explanation for MEI's mistake. MEI states that Morse and French reviewed the "original drawings with Bulletin 5 conduit and cable schedules" in early January 2022 after wondering why there were thousands of feet of extra conduit.[4] (Doc. 209 at 61.) Clearly, changes in Bulletins 1 and 2, which involved the conduit and cable schedules, would not have been clouded in Bulletin 5 because the changes were in the earlier bulletins. MEI "didn't catch" the changes in the Bulletins earlier because the changes were to items that MEI was not installing until December and January. (*Id.* at 61–62.) Based on this explanation, while MEI received the new Bulletins when they came out, MEI likely overlooked changes to the conduit and cable schedules at that time (which was in July and August) because they were not working on those items yet.

While MEI's scope of work from Bulletins 1 and 2 may have increased the scope of work and necessitated a change order, SCS did not breach its duty of good faith. It performed under the agreement by notifying MEI of the change. It was then MEI's responsibility to inform SCS how

---

[3] Although MEI argues in its brief that there is no documentary evidence that it received Bulletin 5, French clearly testified that he reviewed Bulletin 5 and there was a proposed change order for the underground work on the fire pump house submitted based on Bulletin 5. (Doc. 199, Tr. 282:10–13.)

[4] Although this was Plaintiff's explanation as to how MEI realized that the scope of work was enlarged, the court has its doubts. The most likely reason that MEI made this discovery was as a result of Kujawa's January 11 email to French asking about MEI's representation of work completed as compared to the work that was actually done at the job site.

any changes would affect the schedule and a corresponding change in cost. MEI dropped the ball in this instance. The court finds that MEI failed to establish that SCS breached its duty of good faith with respect to issuing bulletins.[5]

MEI further argues that SCS breached its duty of good faith by refusing MEI's change order/recovery plan. As discussed herein, MEI was to submit a proposed change order to SCS. Based upon the evidence at trial, the only proposed change order that was submitted and not approved prior to February 4 was Proposed Change Order No. 16 that was submitted with MEI's recovery plan. (Ex. 967.) As is clear from the evidence, the proposed recovery plan and MEI's Proposed Change Order No. 16 explicitly excluded any costs associated with changes to the bulletins but yet sought an additional $498,832 to complete the work. (*Id.* at 6879.) In response to this submission, SCS notified MEI that it did not believe the recovery plan had merit but that it would continue to review it. SCS also instructed MEI on several occasions to return to work. The court finds that SCS did not breach the duty of good faith by refusing to issue a change order based on MEI's proposed Change Order No. 16. MEI was clearly attempting to renegotiate a lump sum contract after having performed the subcontract for several months. Further, contrary to MEI's position regarding changes in scope of work, the recovery plan did not even account for the changes to the scope in work. The recovery plan does claim that the proposed change order is due to the delays by other contractors but MEI failed to prove that those delays hindered its performance to such a degree that MEI needed an addition $498,832 to complete the initial scope of work bid.

---

[5] While not material to the decision here, the court surmises from the evidence that this failure by MEI to take note of the changes in Bulletins 1 and 2 was likely the underlying cause of this project going awry. Those changes appeared significant, and when MEI belatedly discovered its failure to timely identify those changes, MEI began to scramble to figure out a way to salvage the economics of the deal. Unfortunately, the route MEI chose led to further problems, all as discussed herein.

MEI then submitted Proposed Change Order 19 to SCS on February 8. (Ex. 973 at 7422.) In that submission, MEI requested an additional $1,299,000 to complete the work on the project. This proposed change order was not approved and MEI did not invoice for this proposed change order. SCS again instructed MEI to return to the job site. (Ex. 957.) This requested change order was submitted after MEI materially breached the subcontract. Therefore, SCS has not breached its duty of good faith by failing to accept the proposed change order.

MEI also asserts that SCS breached the subcontract by failing to approve Invoice 1318 for $362,852.50 which was based on Proposed Change Order 20. (Tr. 906.) This was submitted on February 16, which was after MEI materially breached the subcontract. Therefore, SCS did not breach the subcontract or fail to act in good faith by not paying this invoice. Further, the evidence at trial did not support a finding that MEI completed the entire scope of work billed in Invoice 1318. (Doc. 200, Tr. at 141:23–25.)

As the court noted at one point in trial, MEI would have been justified in seeking a change order for the increase in work during the performance of the subcontract. MEI, however, failed to act in accordance with the subcontract by seeking a change order for the increase. Rather, MEI chose to walk off of the job and refuse to perform until the dispute was resolved. This was a material breach of the agreement. And, after the breach, MEI submitted varying invoices and change orders with varying figures and explanations. It essentially appeared that MEI wanted to renegotiate the entire subcontract and not simply be paid for the change in the scope of work. This leaves the court to surmise that MEI simply underbid the project and, upon realizing that it could not financially remain at site and pay its employees decided to jump ship. After reviewing all the evidence and the arguments submitted by the parties, even including other suggested conclusions

submitted in post-trial briefing that are not specifically addressed herein, the court finds that MEI first materially breached the subcontract.

MEI's Additional Allegations of Breach.  Because the court has determined that MEI materially breached the subcontract first, MEI is precluded from succeeding on its claims of breach against SCS.  See *Carlson*, 549 N.W.2d at 379.  As discussed herein, MEI's claim that SCS materially breached the subcontract first are not supported by this court's findings.  The court need not discuss the claims previously discussed but will briefly address the remaining claims in the pretrial order.

MEI asserts that SCS breached the subcontract by failing to pay the retainage held by SCS. (Doc. 205 at 85.)  Under the subcontract, retainage was to be paid upon completion of the entire contract.  (Ex. 801 at 4.)  MEI did not complete the project and materially breached the contract first.  Therefore, SCS is entitled to judgment on MEI's claim of breach by failure to pay out retainage.  Further, MEI only completed 62% of the work but was paid almost 80% of the lump sum contract price.  Therefore, the withholding of 5% of the invoices would not amount to a breach of the subcontract as MEI had already been overcompensated by at least 5% based on the evidence.

In the pretrial order, MEI asserted that SCS breached the subcontract by failing to pay sales tax on the materials and equipment purchased.  (Doc. 126 at 10.)  Although MEI addresses sales tax in some of its proposed findings of facts, MEI does not assert this as a basis for breach in its proposed conclusions of law.  (Doc. 209.)  The court finds that SCS did not breach the subcontract by failing to reimburse MEI for the sales tax it incurred in purchasing material and equipment for the job.  The subcontract states that MEI was liable for sales tax and the evidence is that SCS provided MEI with a sales tax exemption form at the start of the job.

MEI contends that it should be awarded judgment for the lien claims by its own subcontractors and the attorney fees costs in defending the lien claims. (*Id.* at 105.) MEI claims that those liens were due to materials ordered in connection with the project. MEI fails to show how SCS is liable for those amounts under the subcontract. Further, there was no evidence of how the amounts for the lien claims were calculated and what specifically the amounts were for. (Doc. 201 at 210.) Therefore, the court cannot determine whether these claims were waived because they were for materials prior to November 24, 2021, that were already paid for by SCS. Moreover, MEI also removed several pallets of equipment from the job site in February 2022. Essentially, MEI has not met its burden to show that it is entitled to these damages.

MEI also seeks damages from Invoice 1313 in an amount of $5,175.00. MEI submitted this invoice on January 18, 2022 and it was related to MEI's Proposed Change Order 11. There was no evidence that MEI's Proposed Change Order 11 was approved nor was there any evidence that Invoice 1313 was approved.[6] Therefore, MEI failed to establish that SCS breached the subcontract by failing to pay Invoice 1313.

<u>Damages to SCS for MEI's breach</u>. As the court has determined that SCS prevailed on its counterclaim of breach of contract, the court must now make legal findings as to SCS's damages. To be awarded damages, SCS must prove that the damages it sustained flowed from the breach of the subcontract and were reasonably foreseeable by the parties. *HomeStar Prop. Sols., LLC v. Safeguard Props., LLC*, 370 F. Supp. 3d 1020, 1027 (D. Minn. 2019). Further, the damages must not be speculative, remote, or conjectural. *Id.*

---

[6] Notably, MEI's proposed findings of facts and conclusions of law only reference this invoice in its request for damages. (Doc. 209 at 126.) In doing so, MEI cites to a portion of the trial transcript where MEI's counsel informs the court the invoice was never paid. The court asked counsel if that evidence had been presented at trial to which counsel responded affirmatively and then informed the court that the undersigned did not need to hear anything further on Invoice 1313. (Doc. 201, Tr. at 60:17–23.)

SCS asserts that it was entitled to hire a replacement contractor under Section 13 of the subcontract and can recover the costs to pay PCL minus the remaining amount due under the subcontract. (Doc. 204 at 98–99.) Section 13 of the terms and conditions contained in the service order states that

> In the event of the failure by Subcontractor to comply with any of the provisions of this Service Order, SCS may give notice of default to Subcontractor with respect to any such failure. If Subcontractor fails to immediately cure such default, SCS shall have the option, without terminating this Service Order or the obligations hereunder of Subcontractor, of completing the work or any portion thereof itself or having the work, in whole or in part, completed by any third party. The cost of the work performed shall be deducted from the contract price, and if the cost of completing such work exceeds the unpaid balance of the contract price, Subcontractor shall promptly pay the difference to SCS upon receipt of written notice of such excess. Subcontractor shall be liable for all expenses incurred and damages suffered by SCS as a result of Subcontractor's default, and the exercise of any such option by SCS shall not release Subcontractor from such liability.

(Ex. 801 at 20.)

Therefore, SCS was entitled to hire a third party to complete the work under the service order after MEI walked off of the site and refused to return to complete the work. This provision is also consistent with Minnesota law which provides that damages for a breach of contract include the cost of contract completion. *Eng'g & Constr. Innovations, Inc. v. Bradshaw Constr. Corp.*, No. 20-CV-808, 2024 WL 5040395, at *49 (D. Minn. Dec. 9, 2024) (citing *Blaine Econ. Dev. Auth. v. Royal Elec. Co*., 520 N.W.2d 473, 477–79 (Minn. Ct. App. 1994)). The costs incurred to complete the contract, however, must be reasonable. *Id.* (citing *City of Winona v. Jackson,* 100 N.W. 368, 371 (Minn. 1904) ("[T]he measure of [damages incurred due to contractor's default] was the reasonable cost and expense of completing work.").

On February 16, 2025, SCS and PCL executed a contract on a time and material basis for PCL to complete the electrical scope under Bulletin 5. PCL began billing SCS for work on the project on or about February 22, 2022, when PCL mobilized to the site and began reviewing MEI's

26

electrical scope of work to determine what had been completed. PCL completed MEI's work scope on July 21, 2022. The invoices submitted by PCL for that work and the payments for the same were entered into evidence. (Exs. 811–41.) SCS asserts that it paid PCL $1,091,243.79 to complete MEI's scope of work under the project. SCS seeks excess cost completion damages of $785,135.36 which was calculated by subtracting the remaining subcontract funds that were not paid to MEI from the amounts paid to PCL. SCS determined the total price of the subcontract at $1,804,568.04, which includes the lump sum amount contained in the subcontract plus approved change orders 1 through 5. (Exs. 802–06.) The court, however, has determined herein that Change Order No. 6 was approved by SCS; therefore, this increased the subcontract by $86,461.36. The court finds that the total amount of the subcontract as of February 4, 2022 was $1,891,029.10. MEI was paid $1,498,459.61. As such, the maximum amount the court could determine as the excess costs to complete MEI's scope of work based on the evidence was $698,674.[7]

MEI disputes that the amount sought by SCS is recoverable because SCS hired PCL on a time and materials basis instead of a lump sum contract, the amounts are not reasonable, and some costs exceed the scope of MEI's contracted work. The court will address the arguments in turn. First, MEI argues that the damages are not reasonable because a time and materials contract cannot be compared to a lump sum contract. (Doc. 209 at 128; 211 at 28.) While those contracts are different, Plaintiff fails to cite to any authority that it was not reasonable for SCS to contract with PCL on a time and materials basis. Nightingale testified as to why he issued a time and materials contract to PCL in this situation. Due to the abrupt departure of MEI and its conflicting representation regarding the scope of work completed, SCS was wholly unable to determine what work was completed under the subcontract without an electrical subcontractor to review the work

---

[7] To determine this amount, the court subtracted the remaining amount due under the SCS/MEI subcontract ($392,569.79) from the amount SCS paid to PCL ($1,091,243.79).

to determine what was left. (Doc. 201, Tr. at 86:1–88:3.) SCS needed a company that could spend time reviewing all of the cables to find out which ones were terminated and what equipment was finished. This would take a significant amount of time so it was not feasible to do it under a lump sum contract as he was unsure how much work remained and knew that it would take time to determine that. This explanation is entirely reasonable and MEI fails to cite to any credible evidence at trial which would suggest that obtaining a lump sum bid was possible in this situation. The evidence was that MEI had represented significant completion of the work but then less than two short months later had represented that much less work had been completed. MEI then left the site and refused to return. This put SCS in a difficult situation to say the least as the completion of the project was dependent on the electrical work. Time was of the essence under the contract and SCS had its own contractual obligation to the Owner. Further, the decision to hire PCL was reasonable given that PCL had already submitted a bid for the project at the outset and, therefore, was familiar with the project and the work that had been contracted for. The court finds that SCS acted reasonably in hiring PCL on a time and materials contract to finish the work. *See Ramada Dev. Co. v. United States Fid. & Guar. Co.*, 626 F.2d 517, 519 n.5 (6th Cir. 1980) (finding the hiring of a replacement on a time and materials contract to be reasonable in similar circumstances).

MEI asserts that SCS should not be awarded damages for mobilization costs, work performed while waiting for the license, and work prior to obtaining the license on March 21. (Doc. 211 at 29–30.) The evidence showed that PCL began work by reviewing what work had been performed by MEI which took a significant amount of time. Clearly, MEI had been on site and working for several months at this time and there were thousands of cables at the site. Besides arguing that these costs should not be reimbursed, MEI does not make a colorable argument that they were unreasonable. As discussed, it was clear that an electrical company would have to first

28

determine what was completed before the work could continue and MEI had left the site and refused to return. Therefore, SCS reasonably incurred costs in determining the work to be performed. The court finds that these costs were reasonable.

MEI further argues that SCS failed to deduct certain work from its damages. Although PCL performed work that was outside of the work to be completed by MEI, Nightingale and PCL reviewed the work and tracked the costs specifically associated with the MEI subcontract. Nightingale testified that the costs SCS was seeking reimbursement for were all based on the completion of MEI's work under the subcontract. (Doc. 201, Tr. 120:20–124:8; Ex. 1113.) MEI argues that SCS failed to deduct work for the fire pump house installer done by unlicensed personnel. Nightingale testified, however, that a different contractor performed that work. (Doc. 201, Tr. 141:1–7, 157:16–25, 164:11–23.) Therefore, SCS did not need to deduct any cost from PCL's invoices for this work as it was not PCL who performed the work. Further, besides generally arguing that SCS is including these figures, MEI has not pointed to any invoice or evidence which would support finding that SCS has included this in its requested damages.

MEI asserts that there were additional fans and equipment added to PCL's scope of work in June 2022 that were not in MEI's scope of work. (Doc. 211 at 32–33 (citing to Ex. 102.)) MEI contends that Nightingale testified that this was not deducted. According to the testimony cited, Nightingale could not recall if he deducted those specific items but he also generally testified that he did review all of the work with PCL to determine what was outside MEI's scope of work up to Bulletin 5. Although MEI asserts that this work must have been included in the invoices, MEI fails to point to a PCL invoice which bills for this equipment and the corresponding figure on SCS's damages calculation. All of the invoices are in evidence and they all include detailed expenses. Therefore, the fact that Nightingale cannot recall whether a specific expense was

deducted does not show that SCS is attempting to recover a cost that was not in the initial scope of work. MEI's remaining arguments regarding SCS's damages are not persuasive. The court further notes that the evidence at trial was that MEI would complete the work under the subcontract for an additional $1,299,000, which was in addition to the amounts still remaining under the subcontract. This is less than the amount SCS paid to PCL and further supports a finding that the amount was reasonable. In sum, MEI has failed to point to any persuasive evidence that the amounts billed and paid to PCL are unreasonable or that PCL did not complete the scope of work in the subcontract.

The court finds that SCS has proven by a preponderance of the evidence that it paid PCL $1,091,243.79 to complete MEI's scope of work under the project. The court finds that this amount is reasonable, that SCS acted reasonably in hiring PCL, and SCS did not fail to mitigate its damages. Therefore, the court finds that SCS is entitled to $698,674 in excess completion cost damages.

SCS also seeks to recover $289,399.02 in additional damages based on the argument that it overpaid MEI. Essentially, SCS asserts that it should have only paid MEI 67% of the total contract price because that is the amount of work that MEI represented it had completed at the time MEI walked off of the job. (Doc. 204 at 103–04.) SCS's cited authority regarding recoupment is not persuasive. SCS is entitled to be placed in the same position it would be if the contract had been performed by MEI, nothing more. *Christenson v. Milde*, 402 N.W.2d 610, 613 (Minn. Ct. App. 1987) ("[T]he damage award is the monetary amount sufficient to place the plaintiff in the same situation as if the contract had been performed."). Essentially, the law requires SCS to recover the amounts reasonably paid in excess of the subcontract price because SCS bargained for a job to be completed for that price. That is what the court has done in this case.

SCS is not entitled to an additional amount simply because the amount it did pay should have corresponded with the amount of work performed up to that date. Should the court agree with SCS's position here, SCS would essentially receive more than it bargained for. That is not what is required under the law.

SCS also asks the court to award attorney's fees in this matter. The subcontract provides that SCS is entitled to recover attorney's fees and costs in the event of a breach by MEI. (Ex. 801 at 6.) Therefore, as the prevailing party on its claim for breach, SCS is entitled to attorney's fees and may properly move for fees in accordance with the Federal Rules of Civil Procedure.

### B. MEI's Claim Under the Minnesota Prompt Pay Act

MEI also brings claims under the Minnesota Prompt Pay Act ("MPPA"), which requires general contractors to "promptly pay any subcontractor within ten days of receipt by the party responsible for payment of payment for undisputed services provided by the party requesting payment." Minn. Stat. § 337.10, subdiv. 3. To prevail, MEI must prove that it requested payment from SCS for undisputed services, SCS received payment from the owner, and that SCS then failed to pay for those services. MEI asserts that it is entitled to judgment on this claim concerning Invoice 1307. Invoice 1307 was not paid by the owner until February 18, 2022. At the point that SCS received payment, it had disputed the invoice based on the significant disparity in the completion of work represented in that invoice as compared to the completion of work represented by MEI. Based on the evidence at trial, the court finds that MEI is not entitled to judgment on this claim as Invoice 1307 was disputed prior to SCS receiving payment for that invoice by the owner.

MEI also asserts it is entitled to judgment for its claim under the MPPA concerning SCS Change Order 6 which was billed in January. SCS also disputed this invoice in early February. Those two claims appear to be the only ones addressed in MEI's post-trial submission. However,

the pretrial order also asserts a claim under the MMPA for interest on unpaid retainage, interest on the sales tax, and interest on Invoice 1313. The court has already determined that MEI was not entitled to invoice for those matters based on the subcontract as discussed *supra*. Therefore, MEI cannot prevail on its claims for interest under the MPPA for those items.

Further, under the MPPA, a contractor's right to payment of retainage is based on whether there has been substantial completion. Minn. Stat. § 337.10, subd. 4(c). The date of "substantial completion" is determined by the date when construction is sufficiently completed so that the owner or the owner's representative can occupy or use the improvement for the intended purpose." Minn. Stat. § 541.051, sudb. 1(a). Clearly, MEI did not substantially complete the project. Further, the MPPA states that "nothing in this section requires payment for a portion of a contract that is not complete or for which an invoice has not been submitted." Minn. Stat. § 337.10, subd. 4(i). MEI did not complete the contract. MEI materially breached the subcontract and the unambiguous terms of the agreement do not allow recovery on retainage, sales tax, or interest.

The court finds that judgment must be entered in favor of SCS on its claim under the MPPA.

## C.  MEI's Remaining Claims

The pretrial order included a claim of tortious interference with prospective economic gain. MEI makes no legal argument in its proposed findings of fact and conclusions of law that the evidence entitles it to prevail on this claim. (*See* Doc. 209.) Given the factual findings herein, the court finds that SCS is entitled to judgment on MEI's claim of tortious interference with prospective economic gain.

MEI also argues that it should prevail on a claim of conversion because SCS failed to pay MEI for Invoice 1307 even though it received funds from the owner and failed to keep those funds

in a separate trust account. (*Id.* at 90–92.) MEI argues that the court should allow it to amend the pretrial order and add a claim of conversion because new evidence arose at trial regarding SCS's retention of the funds from the owner. MEI presented this motion at the close of the liability evidence. (Doc. 201, Tr. 48–49.) The court denied the motion as the evidence was not new and MEI had knowledge that SCS did not pay on that invoice. Further, the case was presented at trial as a breach of contract and a violation of the MPPA. The parties did not try the issue of conversion by consent, contrary to MEI's arguments. Therefore, Rule 15(b)(2) is inapplicable.

To the extent MEI seeks reconsideration of this court's ruling at trial on this issue, the motion is denied.

### D. Motions for Sanctions

SCS filed motions for sanctions prior to trial due to alleged discovery violations by MEI. (Docs. 149, 151.) SCS requested that the court sanction MEI by striking certain claims of damages, limiting evidence of the damages at trial, precluding the use of certain documents at trial, ordering that MEI abandoned the project on February 4, 2022, and payment of attorney's fees. The court declined to rule on the motions before trial due to the extensive factual disputes surrounding the discovery issues.

Based on the findings and rulings herein, the court finds that SCS's motions for sanctions are denied as moot. The court has found for SCS on its claims and against MEI. Therefore, all relief except for attorney's fees is moot. Further, the subcontract allows SCS to request attorney's fees upon prevailing. Therefore, the court need not separately rule on the motion for sanctions and may consider whether all fees incurred were reasonable.

### III.    Judgment

Judgment is entered in favor of SCS and against MEI on SCS's claim of breach of contract. Judgment is entered in favor of SCS and against MEI on each of MEI's claims.

SCS is awarded damages in the amount of $698,674, plus pre-judgment interest if allowable by law. SCS is to file a motion regarding the amount of prejudgment interest and applicable law on or before August 15, 2025. SCS is also entitled to attorney's fees in this matter in an amount to be determined. Post-judgment interest is also awarded from the date of entry of judgment until paid.

IT IS SO ORDERED. Dated this 23rd day of July 2025.

__ s/ John Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE